# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

NATIONAL FAIR HOUSING ALLIANCE
1331 Pennsylvania Avenue NW, Suite 650
Washington, DC 20005,

                Plaintiff,

           v.

EVOLVE, LLC
1375 Maryland Avenue NE, Unit H
Washington, DC 20002

CHRISTOPHER SWANSON
1375 Maryland Avenue NE, Unit H
Washington, DC 20002,

                Defendants.

Case No.

**COMPLAINT**

Jury Trial Demanded

## NATURE OF ACTION

The National Fair Housing Alliance brings this action against Defendants Evolve, LLC, and Christopher Swanson for declaratory, injunctive, and monetary relief from Defendant's unlawful housing discrimination in violation of the federal Fair Housing Act and D.C. Human Rights Act.

The District of Columbia has an affordable housing crisis, hitting low-income renters hardest. For a lucky few, housing vouchers are a critical lifeline to affordable housing. But vouchers are worthless if landlords refuse to accept them. Refusing to accept vouchers is not only illegal in D.C., it has an unlawful disparate impact on Black and Hispanic renters and female-headed households with children in the D.C. rental market.

Evolve LLC, through its owner Christopher Swanson, is a landlord that refuses—as a

blanket policy—to accept housing vouchers. It publicly advertises "No section 8," excludes voucher holders by denying them appointments to view available units, and tells applicants, "We don't accept housing vouchers." Evolve's policies or practices violate an express prohibition against voucher discrimination in the D.C. Human Rights Act, and have a disparate impact on federally protected classes, in violation of the Fair Housing Act and D.C. Human Rights Act.

Evolve's policies or practices are especially egregious because its properties are located in a high-opportunity neighborhood, characterized by high-performing schools, low poverty, and low crime. As such, the neighborhood is a highly desirable neighborhood for using a voucher. This high-opportunity neighborhood is adjacent to a concentration of low-opportunity neighborhoods with low-performing schools, high poverty, and high crime. Evolve's policies or practices perpetuate segregation by propping up an arbitrary barrier beyond which low-income communities of color and female-headed households with children are unwelcome. This is the type of "artificial, arbitrary, and unnecessary" housing barrier contemplated by the Supreme Court in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, 135 S.Ct. 2507, 2522 (2015) (affirming disparate impact as a cognizable legal theory). Evolve's policies or practices have an adverse and disproportionate impact on protected classes, perpetuate racial segregation, and undermine the federal voucher program.

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this matter under 42 U.S.C. § 3613(a) and 28 U.S.C. § 1343, and supplemental jurisdiction over the D.C. law claims because they are related to Plaintiff's federal claims and share a common nucleus of operative facts. 28 U.S.C. § 1367.

2.      Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside and

conduct business in, and the events giving rise to the claims occurred in, the District of Columbia.

## PARTIES

3.       Plaintiff, the National Fair Housing Alliance ("Alliance"), is a nonprofit public service organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. Its mission is to carry out the dual objectives of the Fair Housing Act, ending housing discrimination and promoting residential integration. It pursues its mission through public education and outreach, leadership and member training, policy advocacy, community development, investigation of fair housing violations, and enforcement of fair housing laws.

4.       Defendant Evolve, LLC ("Evolve") is a privately owned company headquartered and operating in Washington, D.C. that acquires, develops, markets, and leases multifamily residential properties. It is a limited liability company registered with the District of Columbia.[1] Its properties are located in the Capitol Hill neighborhood.

5.       Defendant Christopher Swanson is a co-owner and member of Defendant Evolve LLC who conducts business in the District of Columbia.

---

[1] The publicly accessible records available on the D.C. Department of Consumer and Regulatory Affairs online database do not enumerate Evolve, LLC's members. For purposes of this action, Plaintiff pleads federal question jurisdiction, not diversity jurisdiction.

## FACTUAL ALLEGATIONS

### *Housing Choice Voucher Program (Section 8)*

6.      The Housing Choice Voucher program is the federal government's flagship housing program for extremely low-income families, the elderly, and individuals with disabilities.[2] Congress originally established it as the Section 8 Existing Housing Program.[3] For ease of reference, this Complaint refers to Housing Choice Vouchers as "Section 8 vouchers."

7.      The U.S. Department of Housing and Urban Development ("HUD") provides Section 8 voucher funding to local public housing authorities ("PHAs"), which administer the program locally.

8.      To obtain a voucher, an applicant requests to be added to a waiting list, which is typically very long or closed. If selected from the waitlist, the voucher holder must locate a private landlord with an available rental unit in the local rental market. Finding a rental unit is perilous for most District voucher holders because the housing shortage makes it exceptionally difficult to find available units.[4] Voucher discrimination exacerbates this problem, narrowing housing options and significantly reducing the likelihood that a voucher holder will find an eligible rental unit. This makes it more likely the voucher holder will become homeless.

---

[2] "Extremely low income" means "very low-income families whose incomes do not exceed the higher of … the [federal poverty level] or 30 percent of the median family income for the area." 42 U.S.C. § 1437a(b)(2)(C); *see also* 79 Fed. Reg. 35,940 (June 25, 2014). In 2018, the federal poverty level for a four-person family in Washington, D.C. was an annual household income of $25,100 or less. 83 Fed. Reg. 2642 (Jan. 18, 2018).

[3] Housing and Community Development Act of 1974, Pub. L. No. 93-383, Title II, § 201(a), 88 Stat. 633, 662–66, now codified at 42 U.S.C. § 1437f; *see also* 24 C.F.R. § 982.1 *et seq.*

[4] *See, e.g.*, Jonathan Franklin, *Affordable Housing Crisis Plagues D.C. Residents*, Washington Informer (May 9, 2018) https://washingtoninformer.com/affordable-housing-crisis-plagues-d-c-residents/; Ally Schweitzer, *There's Already a Housing Crisis in the D.C. Area. Will Amazon Make It Worse?* WAMU (Nov. 14, 2018), available at https://wamu.org/story/18/11/14/theres-already-a-housing-crisis-in-the-d-c-area-will-amazon-make-it-worse/.

Voucher discrimination has the direct impact of increasing homelessness.

9.      The Section 8 program makes rent affordable by fixing the family's portion of rent to its household income. If a voucher household finds eligible housing, it pays a percentage—generally 30%—of its income to the landlord and the PHA pays the landlord the remaining market-value rent. For example, a low-income family with a monthly household income of $1,500 might pay $500 for an apartment with a market-rate rent of $1,200 per month, and the PHA would pay the remaining $700 to the landlord. In other words, a landlord receives the same amount of rent regardless of whether the tenant has a voucher.

10.      By offering participants choices, the Section 8 voucher program is designed as a pathway from low-opportunity to high-opportunity neighborhoods. Designed this way, voucher holders are uniquely susceptible to source of income discrimination because they have the burden of finding a landlord willing to accept their voucher. This burden falls on individuals who often lack resources to enforce the laws, in the event they are aware voucher discrimination is illegal, and seek to vindicate their rights. A recent study shows approximately 15% of District landlords illegally discriminate against voucher holders.[5]

11.      Recognizing the critical role vouchers play in lifting poor—and almost exclusively Black and Hispanic—families out of extreme poverty, the District of Columbia outlawed source of income discrimination decades ago. D.C. Human Rights Act, D.C. Code § 2-1402.21(a) (since the original effective date in 1978).

12.      By definition, "source of income" includes vouchers. *Id.* § 2-1402.21(a), (e).

---

[5] Mary K. Cunningham et. al., *A Pilot Study of Landlord Acceptance of Housing Choice Vouchers* (Sept. 2018) (commissioned by HUD), available at https://www.huduser.gov/portal/pilot-study-landlord-acceptance-hcv.html.

***D.C. Voucher Households are Disproportionately Non-White (99%)***

13.    According to the D.C. Housing Authority, 11,503 District households participate in the Section 8 voucher program.[6]

14.    Voucher holders in the District are not representative of the general population. The District's renter population is comprised of a plurality of races and ethnicities (47.5% Black, 34.5% White, 12.1% Hispanic, 5.9% other non-White). By contrast, voucher holders are 99% non-White (92% Black, 4% Hispanic, 3% other non-White) and 1% White.[7, 8] (Figures 1–3.)

15.    Black renters comprise the vast majority of voucher holders. In 2016, nearly all voucher households were Black (92%), while less than one-half (47.5%) of all District renter households were Black.[9] (Figures 1–2.)

16.    Hispanic renters comprise the second-largest group of voucher holders. In 2016, 4% of voucher households were Hispanic.[10] (Figure 3.)

17.    "Other" non-White renters comprise the third-largest group of voucher holders. In 2016, 3% of voucher households were "other" non-White. (Figure 3.)

18.    Finally, White renters comprise the smallest group of voucher holders. In 2016, only 1% of voucher households were White, despite that 34.5% of all District renter households

---

[6] HUD Data on the Characteristics of Voucher Holders for 1-Year 2016 in the District of Columbia, available at https://www.huduser.gov/portal/datasets/assthsg.html.
[7] Exhibit 2, Table 1, Table 2.
[8] The term "White" refers to non-Hispanic White individuals, consistent with data from the U.S. Census Bureau and HUD. This Complaint uses the term "Hispanic" because the relevant data sources use this term. The Alliance acknowledges that some people prefer "Latino," "Latina," or "Latinx." This Complaint seeks to be inclusive and does not mean to exclude or otherwise diminish the identity or experiences of any person or group through use of the term "Hispanic."
[9] Exhibit 2, Table 1.
[10] Exhibit 2, Table 2.

were White. (Figures 1–2.) [11]

19.    Voucher holders are almost exclusively Black or Hispanic. (Figure 3.)

---

[11] Exhibit 2, Table 2.

**Figure 1.**[12]



**Figure 2.**[13]



**Figure 3.**[14]



**Figure 4.**[15]



---

[12] Exhibit 2, Table 1.
[13] *Id.*
[14] *Id*; Exhibit 2, Table 2.
[15] Exhibit 2, Table 2.

***D.C. Voucher Households Are Disproportionately Female-Headed with Children***

20.      In the District, 13.46% of all renter households are female-headed with children, but almost three times as many voucher households are female-headed with children (37%).[16] (Figure 5.)

21.      Fair housing laws prohibit discrimination on the basis of one protected class (*e.g.* sex, meaning female-headed versus male-headed households, or familial status, meaning households with or without children), but also prohibit discrimination based on the intersection of two or more protected classes (*e.g.* sex *and* familial status). Liability may be established for housing practices that discriminate at the intersection of multiple protected statuses.

22.      Evolve's discriminatory practices have a disproportionate impact on female-headed households with children, who represent over one-third (37%) of voucher households. Currently, 77% of voucher households are female-headed[17] and 40% of voucher households have children.[18] The intersection of these two protected classes—female-headed households with children—captures almost all of the voucher households with children and nearly half of all female-headed voucher households. As such, Evolve's refusal to rent to voucher holders grossly and disproportionately affects female-headed households with children.

---

[16] Exhibit 2, Table 3.
[17] Exhibit 2, Table 4.
[18] Exhibit 2, Table 5.

**Figure 5**.[19]



***Defendants' Discriminatory Practices***

23.     On April 10, 2017, the Alliance discovered a rental advertisement for Evolve's property, prompting the Alliance to take further action to investigate whether Evolve had a policy or practice of discriminating against vouch holders or other protected classes and the full extent of potential discriminatory conduct.

24.     The investigation uncovered that Evolve discriminated against potential tenants based on source of income in at least three ways: (1) publishing discriminatory advertisements stating "No section 8," (2) screening out voucher holders by asking applicants whether they use a voucher, then refusing to schedule apartment showings to voucher holders, and (3) unequivocally telling applicants, "we don't accept housing vouchers."

25.     The investigation revealed that Defendants engaged in a continuing violation of

---

[19] Exhibit 2, Table 3.

the Fair Housing Act and D.C. Human Rights Act through a blanket policy or practice of refusing to accept housing vouchers, carried out by Christopher Swanson in at least three ways.

26.     Upon information and belief, Christopher Swanson personally established and carried out Evolve's policy or practice of refusing to accept Section 8 vouchers. Accordingly, all references in this Complaint to Defendant's Evolve's policy or practice are also intended as allegations that Christopher Swanson maintained the same policy or practice, and that Evolve and Christopher Swanson were one in the same for all purposes relevant to this Complaint.

27.     First, the Alliance uncovered a series of discriminatory advertisements. Two examples are representative. One is an advertisement published on Evolve's website, www.evolvedc.com, which stated "No section 8." (Figure 6.) The second is an advertisement published on the popular website www.Craigslist.org for the Washington, D.C. metro area. That advertisement featured the same language under the heading "Lease Terms": "No section 8." (Figures 7–8.) The advertisement listed Defendant Christopher Swanson as the point of contact. (Figure 8.)

**Figure 6. Evolve Website: "No section 8"**

**Figure 7. Craigslist.org Advertisement: "Lease Terms: No section 8"**
**(Page 1 of 2)**



**Figure 8. Craigslist.org Advertisement: "Lease Terms: No section 8"**
**(Page 2 of 2)**

cardio fitness room, sitting garden with community gas grill and 1/2 priced Wi-Fi from DC Access. Best of all The Barbara is extremely pet friendly by accepting up to two cats or up to 80 lbs. of one dog (no breed restrictions) with an approved Pet Application and $100 Pet Deposit per pet. Additionally residents are encouraged to take advantage of our state-of-the-art Resident Portal to view building announcements, make online rent payments electronically and to report and track any issues with your apartment.

**Rooms and Interior**
. High ceilings
. Hardwood floors
. Living room
. Ceiling fans
. Voice Intercom

**Building and Surroundings**
. Vintage building
. Small building
. Recently renovated
. Secured entry
. Garden
. Yard

**Amenities and Services**
. Fitness center
. Bike room
. Storage unit
. Grill / Barbecue

**Lease Terms**
. Pets negotiable
. Dogs ok
. Cats ok
. Tenant pays gas and electric
. One year lease
. No smoking building
. No section 8
. Trash removal included
. Water included

**Contact Us:**
Evolve
Christopher Swanson
(show contact info)

See better photos and **SCHEDULE A SHOWING** at:

**http://schedule-a-viewing.com/lc/2fcc5260d1**

28.    Second, the investigation uncovered Evolve's discriminatory screening process. Evolve's agents, including Christopher Swanson, referred applicants to its website to schedule in-person apartment showings. There, an applicant can click "Schedule a Showing," which takes the applicant to a webform. The webform requires applicants to type information such as name, phone number, email address, and preferred showing times into open fields. It also requires the prospective tenant to answer several yes/no questions. Among the required questions is: "Do you intend to use a Section 8 Voucher to pay your monthly rent?" ("the Section 8 Question"). An applicant must answer the question using a drop-down menu with just two options: "yes" or "no." A prospective tenant cannot skip the question.

29.    If an applicant answers "yes," to the Section 8 Question, the webform automatically denies showings and displays the message, "We're sorry, but you do not meet one or more of the requirements for the listing."

30.    If an applicant answers "no," to the Section 8 Question and keeps all other responses the same, the webform schedules and confirms a showing for the requested date. In other words, the Section 8 Question is outcome-determinative. By simply switching the answer to the Section 8 Question from "yes" to "no," a prospective tenant can schedule a showing.

### *Results of Fair Housing Testing*

31.    Based on this evidence of discrimination, the Alliance initiated a formal investigation and assigned fair housing "testers" to evaluate the nature and extent of Evolve's

discriminatory policies and practices.[20] Testing uncovered a series of admissions proving that

Evolve has a blanket policy of refusing to accept vouchers.

---

[20] Fair housing "testing" is a common practice for documenting housing discrimination. Testers are trained to pose as prospective renters, asking certain questions that are designed to reveal unlawful discriminatory treatment. In this case, the testers attempted to apply for available units in Defendants' properties. The tests were conducted by (1) website, (2) telephone, and (3) in-person. In this case, the objective was to determine if Defendants treated prospective tenants differently depending on their membership in a protected class. Relevant here are race, national origin, familial status (*i.e.* family with or without children), sex (*i.e.* female-headed household), and source of income (*i.e.* voucher).

32.    In June 2017, a tester posing as a Section 8 voucher holder attempted to schedule an apartment viewing on Evolve's website. The tester was unable to view—let alone rent—the apartment because Evolve's website would not allow a voucher holder to schedule an appointment. Within minutes, another tester—this time posing as a non-voucher holder—tried to schedule an appointment to view the same apartment. That tester provided the same information as the previous tester, except she indicated that she would *not* use a Section 8 voucher. She was able to schedule a viewing and was shown the property. Finally, a third tester—also posing as a non-voucher holder—was also able to use the webform to schedule a showing.

33.    In June 2017, a tester posing as a Section 8 voucher holder called the phone number listed in Evolve's advertisements. The tester spoke with Evolve's agent, Defendant Christopher Swanson. Swanson confirmed the apartment was available. The tester explained that she had tried to schedule a showing on Evolve's website, but she was unable. Swanson asked the tester if she "intended to use a Section 8 voucher to pay [her] monthly rent?" The tester responded affirmatively, to which Swanson said, "That's what kicked you out. We don't accept housing vouchers."

34.    Shortly thereafter, Swanson represented that the apartment had been rented and was no longer available.

35.    In February 2018, Evolve advertised another available apartment. A tester posing as a voucher holder attempted to schedule an apartment viewing on Evolve's website. Again, the tester was unable to schedule a showing because the website would not schedule voucher holders. The tester then called Christopher Swanson, who was listed as the point of contact in the advertisement.. The tester described how she tried to schedule a showing but was denied. Swanson asked the tester, "Do you pay rent with a Section 8 voucher?" The tester replied, "Yes, I do." Swanson responded, "We do not take section 8 vouchers. That's probably the error you're getting…. That's probably why it got kicked out." The tester asked whether Evolve had any available units for vouchers. Swanson said no.

36.    Based on this evidence, in April 2018 the Alliance filed an administrative complaint against Evolve with the D.C. Office of Human Rights ("D.C. OHR"), alleging source of income discrimination in violation of the D.C. Human Rights Act of 1977 ("DCHRA"). D.C. Code § 2-1402.21. (Case no. 19-155-H(N)). On April 8, 2019, the parties entered into a two-week tolling agreement with regard to all claims in this Complaint. After unsuccessful settlement negotiations, the Alliance withdrew its administrative complaint from the D.C. OHR and filed this Complaint.

37.    Evolve's policy or practice of refusing to rent to Section 8 voucher holders violates the DCHRA, D.C. Code § 2-1402.21, and has a disproportionately adverse effect on prospective tenants based on race, national origin, sex, and familial status in violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a), (c) and the DCHRA, D.C. Code §§ 2-1402.21(a), 2-1402.68.

### *Harm to Plaintiff*

38.     Defendants' actions have harmed the Alliance and the communities it serves. Defendants' illegal refusal to accept Section 8 vouchers frustrates the Alliance's mission of ensuring that all people have equal access to housing opportunities.

39.     The Alliance has committed, is committing, and will continue to commit scarce resources to identify and counsel potential renters impacted by Defendants' unlawful discriminatory policies or practices, investigate complaints, engage in education and outreach, and develop and disseminate education materials to ameliorate the effects of Defendants' against Section 8 voucher households.

40.     Beginning in spring 2017, and prior to the filing of this Complaint, the Alliance diverted staff time and other scarce resources from regular activities in order to investigate and counteract Defendants' actions. But for Defendants' policy or practice of refusing to accept Section 8 vouchers, the Alliance could have focused its resources on previously scheduled programming and activities. The Alliance was compelled to divert resources because Defendants' practices constitute unlawful discrimination on the basis of source of income, have a disparate impact on several protected classes, and perpetuate residential segregation by propping up an artificial barrier between low-opportunity and high-opportunity neighborhoods.

41.     The Alliance devoted considerable staff time and resources to efforts to identifying the nature and scope of Defendants' discriminatory conduct. When the Alliance uncovers evidence of discrimination, it is compelled to divert scarce resources to address the discriminatory activity through public education and outreach, advocacy, training and consulting, community development, and enforcement. Because it is not only necessary to remedy past discrimination, but to take steps to prevent similar discrimination from occurring in the future,

the discrimination typically necessitates public outreach and education to counteract harms, specifically directed at communities likely to have been affected by the discriminatory conduct.

42.     Defendants' discriminatory conduct frustrates the Alliance's mission of ending housing discrimination and promoting residential integration. Specifically, Defendants' blanket policy of rejecting voucher holders frustrates the Alliance's mission by violating the federal and District of Columbia fair housing laws that the Alliance seeks to enforce, undermining rather than advancing equal housing opportunities by making fewer housing units available to all District residents regardless of their protected class status, perpetuating residential segregation instead of integrating residents, and imposing disproportionate injuries on the District's low-income Black and Hispanic renters as well as female-headed households with children. These harms run counter to the Alliance's central goals. Moreover, as detailed below, the Alliance operates a security deposit assistance program, which is undermined by Defendants' unlawful voucher discrimination.

## Scope of the Alliance's Counteraction

43.     To counteract Defendants' discriminatory conduct, the Alliance devoted considerable staff time and resources to identifying the nature and scope of Defendants' discriminatory conduct and taking actions to mitigate its discriminatory impact. Prior to filing this action, the Alliance devoted staff time, engaged in community outreach, and conducted a public education campaign to raise awareness among voucher holders, landlords, and policymakers. These counteraction activities are different from the regular, day-to-day activities of the Alliance. They were carried out as a direct response to the Defendants' discriminatory practices. Each activity was contemporaneously documented in a central timekeeping system.

44.     The following are representative examples of its counteraction activities:

a.    **Staff Time**: The Alliance diverted staff time to researching the voucher program

and the impact of source of income discrimination in the District. This included

attending an income discrimination workshop on April 24, 2017, at the 16th

Annual Fair Housing Symposium. Since learning of Defendants' actions in April

2017, Alliance staff members consistently diverted their time from other

responsibilities, such as developing partnerships and alliances with other

organizations, drafting grant proposals, carrying out grant-related activities, and

investigating alleged violations in other cities. Staff members also attended

training programs and reviewed training materials on collecting and analyzing

data necessary to investigate and document illegal practices like voucher

discrimination that have a disparate impact on protected classes.

b.    **Targeted Outreach to Organizations**: Alliance staff members designed a

targeted outreach campaign to counteract Defendants' discriminatory conduct

with a specific focus on voucher discrimination.[21] First, Alliance staff members

devoted time to compiling a targeted list of D.C. nonprofits and agencies that

assist individuals with housing vouchers. Second, Alliance staff members

designed outreach materials addressing voucher discrimination that identified the

Alliance as a resource for reporting and combatting voucher discrimination.

Third, Alliance staff members conducted in-person outreach to over 80 District

locations to distribute information about housing discrimination, focusing on

source of income discrimination. Targeted locations included churches,

community centers, and nonprofits serving low-income District residents who

---

[21] *See* Exhibit 1.

may have been affected by Defendants' policy or practice of denying housing to voucher holders. At each of these organizations, Alliance staff members spoke to representatives about fair housing and identified the Alliance as a resource for reporting housing discrimination. Staff members conducted in-person outreach in shifts between July 28, 2017 and August 11, 2017. By August 7, 2017, staff members visited 65 targeted organizations. On August 11, 2017, staff members visited another 20 targeted organizations. As a result of this outreach, several organizations contacted the Alliance to request follow up trainings on housing discrimination and Spanish versions of flyers to distribute to their clients.

c.   **Direct Public Education**:

    i.   Newsletters and PSAs: On August 3, 2017, the Alliance disseminated a Housing Choice Voucher advertisement to a community organization, ONE DC, for its monthly newsletter. ONE DC is an active community-development organization that addresses racial and economic inequality in the District. The Alliance later designed and placed a full-page public service announcement in the Washington, D.C. print edition of the *Afro-American*, a local weekly newspaper, beginning January 19, 2019. The newsletter advertisement and public service announcement were designed to educate the public about source of income discrimination. The advertisement was intended to reach renters who tried to rent from Defendants or might apply to Defendants in the future.

    ii.   Public Presentations: On August 8, 2017, a staff member conducted a training on source of income discrimination at the Latino Economic

Development Center ("LEDC"). Many of LEDC's clients have or seek housing assistance and are vulnerable to source of income discrimination.

iii. Community Events: On August 18, 2017, three Alliance staff members attended a community event at Brookland Manor, an apartment building in Washington, D.C., where they provided information about housing discrimination to attendees. Prior to the event, staff members designed and planned public education materials to counteract the effects of Defendants' source of income discrimination. Staff specifically disseminated a form about how to report source of income discrimination.

iv. Online and Social Media Campaign: Beginning July 31, 2017, the Alliance published "Housing Voucher Discrimination in D.C." content on its website. This information was provided to educate the general public—including landlords and tenants—about fair housing laws and source of income discrimination. The Alliance also posted a series of public service announcements across multiple social media platforms, including a series of awareness-raising posts on Facebook and Twitter.

v. Inclusive Communities Grant Program: Defendants' actions harm the Alliance's program designed to support voucher holders. The Alliance operates a security deposit assistance program for D.C. residents in subsidized programs, including voucher holders. The Alliance's assistance program is especially important for Section 8 voucher holders because the voucher program does not typically cover security deposits. The D.C. Housing Authority often refers voucher holders to the assistance program.

Defendants' voucher discrimination harms the effectiveness of Plaintiff's program, which is designed to enable participating residents to obtain safe, affordable housing and prevent homelessness.

## CAUSES OF ACTION

### COUNT ONE

### PERPETUATION OF RACIAL SEGREGATION
### FAIR HOUSING ACT, 42 U.S.C. § 3601 *et seq.*

45. Plaintiff realleges and incorporates by reference all foregoing allegations.

46. The Fair Housing Act prohibits discriminatory conduct that perpetuates or furthers segregation.

47. Defendants' policy of refusing Section 8 vouchers has the effect of perpetuating residential segregation by race in the District.

48. Defendants' properties are "dwellings" within the meaning of the FHA because they are buildings "occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b).

49. FHA liability may be established based on either or both of two separate and distinct theories of discriminatory effect: (1) a defendant's policy or practice "perpetuates segregated housing patterns" or (2) "actually or predictably results in a disparate impact on [a protected class]." 24 C.F.R. § 100.500(a).[22]

50. Discriminatory intent is not required to establish liability. 24 C.F.R. § 100.500.

51. Defendants' properties are located in majority-White, high-opportunity neighborhoods adjacent to majority-Black, low-opportunity neighborhoods. The U.S. Census Bureau records demographic statistics by census tracts, which are units of measure similar to multi-block neighborhoods. In 2010, the census tract where Defendants' relevant property was located was 76% White.[23]

52.     The Capitol Hill census tract where Defendants' property is located is an

opportunity transition point for voucher holders, particularly those seeking to access less

segregated, high-opportunity neighborhoods. (Figure 9.) Almost all nearby census tracts to the

east of Defendants' property were majority-Black.[24] Defendants act as a gatekeeper of an

arbitrary barrier between these neighborhoods by denying renters with vouchers—who are 99%

non-White—the choice to move into a high-opportunity neighborhood to take advantage of the

well-documented benefits of living in a high-opportunity neighborhood.[25] Defendants' actions

perpetuate racial segregation in violation of the FHA by excluding voucher holders—who are

almost exclusively non-White renters.  Congress passed the FHA to combat arbitrary barriers to

integrated housing. A decision, policy, or practice that perpetuates segregation in housing on the

basis of a protected class contravenes the FHA, 42 U.S.C. § 3604(a); 24 C.F.R. § 100.500(a).

53.     By denying voucher holders—who are almost exclusively non-White—the

opportunity to use their voucher in a predominantly White and high-opportunity neighborhood,

Defendants' policy or practice predictably and actually perpetuates racial segregation in violation

of the FHA, and undermines the voucher program.

54.     Defendants' policy or practice does not have a substantial, legitimate,

---

[22] *See* Robert G. Schwemm, *Segregative-Effect Claims Under the Fair Housing Act*, 20 N.Y.U. J. LEGIS. & PUB. POL'Y 709 (2017).

[23] Census Tract No. 81.00 was 76% White, 15% Black, and 4.6% Hispanic. Neighborhood Info DC, *DC 2010 Tract Profile – Population: Tract 81.00*, Urban Institute (August 16, 2017) (2010 Census Data), available at https://www.neighborhoodinfodc.org/censustract10/Nbr_prof_trct121.html.

[24] For illustration, Census Tract No. 68.01 (closest to Defendants' census tract) was 31% White, 62% Black, and 3.8% Hispanic. Census Tract 68.04 was just 2.5% White, 87% Black, and 8.6% Hispanic. Census Tract 79.01 was 9.2% White, 87% Black, and 3% Hispanic. Neighborhood Info DC, *2010 Census Tracts*, Urban Institute (August 16, 2017) available at https://www.neighborhoodinfodc.org/censustract10/census.html.

[25] *See* Raj Chetty et al., *The Effects of Exposure to Better Neighborhoods on Children: New Evidence from the Moving to Opportunity Experiment*, HARVARD UNIV. (2016),

nondiscriminatory objective. Even if its policy or practice were to have some business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives.

55.     Defendants' discriminatory behavior has frustrated Plaintiff's mission by perpetuating segregation. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investigating, and counteracting Defendants' unlawful conduct. Moreover, Defendants' actions have undermined the effectiveness of Plaintiff's tenant assistance programs. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

56.     Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

---

http://scholar.harvard.edu/files/hendren/files/mto_paper.pdf [http://perma.cc/9SUT-VTMN]; Raj Chetty & Nathaniel Hendren, *The Impacts of Neighborhoods on Intergenerational Mobility: Childhood Exposure Effects and County-Level Estimates*, HARVARD UNIV. (2015), http://scholar.harvard.edu/files/hendren/files/nbhds_paper.pdf [http://perma.occ/976S-F2LR].

**Figure 9. Racial Distribution by Census Tract**



## COUNT TWO

**DISPARATE IMPACT ON BASIS OF RACE OR COLOR**
**FAIR HOUSING ACT, 42 U.S.C. § 3601** *et seq.*
**D.C. HUMAN RIGHTS ACT OF 1977, D.C. Code § 2-1402.21(a)(1)**

57.     Plaintiff realleges and incorporates by reference all foregoing allegations.

58.     Defendants' exclusionary policy or practice unlawfully discriminates against Black residents because its refusal to rent to people with Section 8 vouchers impacts Black residents substantially more than White residents.

59.     The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race …." 42 U.S.C. § 3604(a).

60.     The FHA also makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race …." 42 U.S.C. § 3604(c).

61.     FHA liability may be established based on either or both of two separate and distinct theories of discriminatory effect: (1) a defendant's policy or practice "perpetuates segregated housing patterns" or (2) "actually or predictably results in a disparate impact on [an FHA-protected group]." 24 C.F.R. § 100.500.

62.     Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property" if such a practice is "wholly or partially… based on the actual or perceived: race … of any individual." D.C. Code § 2-1402.21(a)(1).

63.     Under the "Effects Clause" of the DCHRA, D.C. Code § 2-1402.68, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 29 (D.C. 1987) (en banc).

64.     Discriminatory intent is not required to establish liability under the FHA or under the DCHRA. 24 C.F.R. § 100.500; *Gay Rights Coalition*, 536 A.2d at 29.

65.     Defendants have a blanket policy of refusing to accept Section 8 vouchers.

66.     Black households comprise a disproportionate number of voucher households. While less than one-half (47.5%) of District renter households are Black, nearly all (92%) of Section 8 voucher households are Black.[26] In contrast, while one-third (34.5%) of District renter households are White, almost none (1%) of Section 8 voucher households are White.[27]

67.     A comparison of renters eligible for Section 8 vouchers demonstrates the disparate impact on the basis of race or color. Out of all Black renters in D.C., 68.31% (53,493 out of 78,312) are eligible for vouchers, whereas only 16.31% (9,285 out of 56,959) of White renters are eligible for vouchers.[28] In other words, Defendants' policy or practice of refusing to accept Section 8 vouchers is **4.19 times** as likely to adversely impact Black renters compared to White renters. Defendants' discriminatory policy or practice of refusing to accept Section 8 vouchers is more likely to exclude and adversely impact Black voucher households than White voucher households.[29]

---

[26] *See* Exhibit 2, Table 1.
[27] *Id.*
[28] *Id.*
[29] *Id.*

68.     When viewed as a percentage of households by race, 13.5% of all Black renter

households in the District use Section 8 vouchers (10,583 of 78,312), while just 0.2% of White

households use Section 8 vouchers (115 of 56,959).[30] In other words, Black renters are

significantly more likely to use vouchers, and are significantly more likely to be adversely

affected by landlords who refuse vouchers.

69.     Each of the ways that Defendants discriminate against Section 8 voucher holders

predictably and actually results in a significantly disproportionate impact on Black households:

a.    First, Defendants' policy or practice of advertising that it does not accept Section

8 vouchers has a disproportionate impact on Black households.

b.    Second, Defendants' policy or practice of screening Section 8 voucher holders so

they may not schedule an apartment showing has a disproportionate impact on

Black households.

c.    Third, Defendants' policy or practice of informing Section 8 voucher holders that

they may not use their vouchers at Defendants' properties has a disproportionate

impact on Black households.

70.     Defendants' policy or practice has a discriminatory impact on Black households.

Its policy or practice predictably and actually disproportionately harms Black households

because they are more likely to participate in the Section 8 voucher program in the District than

the relevant non-protected group, in this case White households.

71.     Defendants' policy or practice does not have a substantial, legitimate,

nondiscriminatory objective. Even if its policy or practice were to have some business purpose,

less discriminatory alternatives are and have been available to Defendants to achieve those

---

[30] *See id.*

objectives.

72.     Defendants' discriminatory behavior has frustrated Plaintiff's mission by perpetuating unlawful discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investigating, and counteracting Defendants' unlawful conduct. Moreover, Defendants' actions have undermined the effectiveness of Plaintiff's tenant assistance programs. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

73.     Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## COUNT THREE

### DISPARATE IMPACT ON BASIS OF NATIONAL ORIGIN
### FAIR HOUSING ACT, 42 U.S.C. 3601 *et seq.*
### D.C. HUMAN RIGHTS ACT OF 1977, D.C. Code § 2-1402.21(a)(1)

74.     Plaintiff realleges and incorporates by reference all foregoing allegations.

75.     Defendants' policy disproportionately impacts Hispanic renters. Defendants' exclusionary policy of denying housing to voucher holders discriminates against Hispanic households on the basis of their national origin because its refusal to rent to people with Section 8 vouchers impacts Hispanic residents substantially more than White residents.

76.     The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of … national origin." 42 U.S.C. § 3604(a).

77.     Under the FHA it is also unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or

rental of a dwelling that indicates any preference, limitation, or discrimination based on …

national origin." 42 U.S.C. § 3604(c).

78.     FHA liability may be established based on either or both of two separate and

distinct theories of discriminatory effect: (1) a defendant's policy or practice "perpetuates

segregated housing patterns" or (2) "actually or predictably results in a disparate impact on [an

FHA-protected group]." 24 C.F.R. § 100.500(a).[31]

79.     Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to

initiate or conduct any transaction in real property" if such a practice is "wholly or partially…

based on the actual or perceived… national origin … of any individual." D.C. Code § 2-

1402.21(a)(1).

80.     Under the "Effects Clause" of the DCHRA, D.C. Code § 2-1402.68, "despite the

absence of any intention to discriminate, practices are unlawful if they bear disproportionately on

a protected class and are not independently justified for some nondiscriminatory reason." *Gay

Rights Coalition*, 536 A.2d at 29.

81.     Discriminatory intent is not required to establish liability under the FHA or under

the DCHRA. 24 C.F.R. § 100.500; *Gay Rights Coalition*, 536 A.2d at 29.

82.     In 2016, Hispanic households comprised 4% of Section 8 voucher renters while

White households comprised only 1% of Section 8 voucher renters. Accordingly, the disparity

ratio of Hispanic to White voucher users is 4:1.[32]

83.     A comparison of renters eligible for Section 8 vouchers demonstrates the

disparate impact on the basis of national origin. Out of all Hispanic renters in D.C., 50.8%

---

[31] *See* Robert Schwemm & Cal Bradford, *Proving Disparate Impact in Fair Housing Cases After
Inclusive Communities*, 19 N.Y.U. J. LEGIS. & PUB. POL'Y 685 (2016).
[32] Exhibit 2, Table 2.

(10,158 out of 19,998) are eligible for vouchers, whereas only 16.30% (9,285 out of 56,959) of White renters are eligible for vouchers.[33] In other words, Defendants' policy or practice of refusing to accept Section 8 vouchers is **<u>3.12 times</u>** as likely to adversely impact Hispanic renters compared to White renters.

84.     Defendants' policy or practice of refusing to accept Section 8 vouchers has a discriminatory effect on the basis of national origin because it predictably or actually disproportionately impacts Hispanic households.

85.     Defendants' policy or practice does not have a substantial, legitimate, nondiscriminatory objective. Even if its policy or practice were to have some business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives. 24 C.F.R. § 100.500(b).

86.     Defendants' discriminatory behavior has frustrated Plaintiff's mission by perpetuating unlawful discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investigating, and counteracting Defendant's unlawful conduct. Moreover, Defendants' actions have undermined the effectiveness of Plaintiff's tenant assistance programs. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

87.     Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

---

[33] *Id.*

## COUNT FOUR

**DISPARATE IMPACT ON FEMALE-HEADED HOUSEHOLDS WITH CHILDREN**
**FAIR HOUSING ACT, 42 U.S.C. 3601 *et seq.***
**D.C. HUMAN RIGHTS ACT OF 1977, D.C. Code § 2-1402.21(a)(1)**

88.     Plaintiff realleges and incorporates by reference all foregoing allegations.

89.     Defendants' policy of refusing housing vouchers has a disproportionate impact on

two protected classes, female-headed households (basis of sex) and families with children

(familial status). Particularly harmful is Defendants' impact on the combination of the two

classes: female-headed households with children. Each form of discrimination has a disparate

impact on the basis of a protected class.

90.     The FHA makes it unlawful to "refuse to sell or rent after the making of a bona

fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or

deny, a dwelling to any person because of … familial status …." 42 U.S.C. § 3604(a). The FHA

makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to

negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any

person because of … sex …." 42 U.S.C. § 3604(a).

91.     It is also unlawful to "make, print, or publish, or cause to be made, printed, or

published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling

that indicates any preference, limitation, or discrimination because of … familial status …."

42 U.S.C. § 3604(c). The FHA also makes it unlawful to "make, print, or publish, or cause to be

made, printed, or published any notice, statement, or advertisement, with respect to the sale or

rental of a dwelling that indicates any preference, limitation, or discrimination because of …

sex …." 42 U.S.C. § 3604(c).

92.     FHA liability may be established based on either or both of two separate and

distinct theories of discriminatory effect: (1) a defendant's policy or practice "perpetuates segregated housing patterns" or (2) "actually or predictably results in a disparate impact on [an FHA-protected group]." 24 C.F.R. § 100.500.[34]

93.     Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property" if such a practice is "wholly or partially… based on the actual or perceived ... sex… of any individual." D.C. Code § 2-1402.21(a)(1).

94.     Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property" if such a practice is "wholly or partially… based on the actual or perceived ... familial status… of any individual." D.C. Code § 2-1402.21(a)(1).

95.     Under the "Effects Clause" of the DCHRA, D.C. Code § 2-1402.68, "despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason." *Gay Rights Coalition*, 536 A.2d at 29.

96.     Discriminatory intent is not required to establish liability under the FHA or under the DC HRA. 24 C.F.R. § 100.500; *Gay Rights Coalition*, 536 A.2d at 29.

97.     On the basis of sex:

   a.     A comparison of household composition illustrates the disparate impact. The first comparison is the percentage of voucher households that are female-headed with the percentage that are not female-headed. In the District, more than three-fourths (77%) of voucher households are

---

[34] *See* Schwemm & Bradford, *supra* n.31.

female-headed.[35] The remaining quarter (23%) are not female-headed. The disparity ratio is 3.35. In other words, Defendants' policy of denying housing to voucher holders is **<u>3.35 times</u>** more likely to affect a female-headed household who has a voucher, and is therefore significantly more likely to adversely impact voucher holders on the basis of sex.

b. Viewed another way, there are significantly more female-headed households that are eligible for vouchers than non-female headed households. For the former, 62.27% (46,806 of 75,169) of female-headed households are eligible for vouchers. By comparison, the remaining 37.73% (28,363 of 75,169) are non-female headed households eligible for vouchers. The disparity ratio is 1.65 (62.27/37.73). In other words, Defendants' policy of denying housing to voucher holders is **<u>1.65 times</u>** more likely to adversely impact households eligible for vouchers on the basis of sex.[36]

98. On the basis of familial status:

a. In the District, one-fifth (19.91%) of all rental households have children. Twice as many voucher households (40%) have children.[37]

b. A comparison of household composition illustrates the disparate impact. The comparison is the percentage of renter households with children that are eligible for vouchers compared to renter households with children that are not eligible. In the District, 27.68% (20,808 of 75,169) of rental

---

[35] Exhibit 2, Table 4.
[36] *Id.*
[37] Exhibit 2, Table 5.

households with children are eligible for Section 8 vouchers. By comparison, the remaining 13.4% (12,033 of 89,772) of households with children are not eligible for Section 8 vouchers. The disparity ratio is 2.07 (27.68/13.4). In other words, Defendants' policy of denying housing to voucher holders is **2.07 times** more likely to adversely impact households that are eligible for vouchers on the basis of familial status.[38]

99.    Viewed at the intersection of sex and familial status, female-headed households with children compromise a disproportionate number of all voucher households and are disproportionately impacted by anti-voucher policies. While one in seven (13.46%) of all District renter households are female-headed with children, a disproportionate one in three (37%) voucher households are female-headed with children. In other words, there are nearly three times as many female-headed households with children using vouchers.

100.    Defendant's policy of refusing Section 8 vouchers has a disproportionate impact on female-headed households with children compared to other rental households. Defendants' policy discriminates against female-headed households (basis of sex) and households with children (basis of familial status) and is particularly harmful to households of both protected classes.

101.    Defendants' policy or practice does not have a substantial, legitimate, nondiscriminatory objective. Even if its policy or practice were to have some business purpose, less discriminatory alternatives are and have been available to Defendants to achieve those objectives.

102.    Defendants' discriminatory behavior has frustrated Plaintiff's mission by

---

[38] *Id.*

perpetuating unlawful discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investigating, and counteracting Defendants' unlawful conduct. Moreover, Defendants' actions have undermined the effectiveness of Plaintiff's tenant assistance programs. Accordingly, Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

103.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## COUNT FIVE

### DISCRIMINATORY TREATMENT: SOURCE OF INCOME
### D.C. HUMAN RIGHTS ACT OF 1977, D.C. Code § 2-1402.21(a)(1)

104.    Plaintiff realleges and incorporates by reference all foregoing allegations.

105.    Defendants' policy or practice of refusing Section 8 vouchers violates the D.C. Human Rights Act because it subjects voucher holders to disparate treatment on the basis of their source of income—their government-subsidized voucher.

106.    The DCHRA makes it an "unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property" if such a practice is "wholly or partially…based on the actual or perceived … source of income … of any individual." D.C. Code § 2-1402.21(a)(1).

107.    It is also unlawful to make any "statement…with respect to a transaction, or proposed transaction, in real property, or financing related thereto" that indicates "any preference, limitation, or discrimination based on" the "source of income … of any individual." D.C. Code § 2-1402.21(a)(5).

108.     By definition, source of income includes Section 8 vouchers. D.C. Code §§ 2-1402.21(a), (e).

109.     Defendants' refusal to accept Section 8 vouchers for rental units in its properties is unlawful discrimination based on the actual or perceived source of income of individuals, in violation of D.C. Code § 2-1402.21(a)(1).

110.     Defendants' advertisements, website screening, and oral statements refusing vouchers constitute unlawful based on the actual or perceived source of income, in violation of D.C. Code § 2-1402.21(a)(5).

111.     Each of the ways that Defendants discriminate against Section 8 voucher constitutes disparate treatment on the basis of source of income:

> a. First, Defendants' policy or practice of advertising that it does not accept vouchers is disparate treatment of voucher holders.
>
> b. Second, Defendants' policy or practice of screening out voucher holders on its website is disparate treatment of voucher holders.
>
> c. Third, Defendants' policy or practice of telling prospective applicants Defendant does not accept vouchers is disparate treatment of voucher holders.
>
> d. Fourth, Defendants' blanket policy or practice of rejecting all vouchers is disparate treatment of voucher holders.

112.     Defendants' discriminatory conduct has frustrated Plaintiff's mission by subjecting voucher holders to unlawful discrimination. Additionally, Defendants' actions have caused Plaintiff to divert substantial time and resources from its usual activities to detecting, investigating, and counteracting Defendants' unlawful conduct. Moreover, Defendants' actions have undermined the effectiveness of Plaintiff's tenant assistance programs. Accordingly,

Plaintiff has been injured by Defendants' discriminatory conduct and has suffered damages as a result.

113.    Defendants' conduct was intentional, willful, and made in reckless disregard of the known rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants as follows:

a.    Declaring that Defendants' acts, policies or practices, and statements willfully refusing to accept housing vouchers alleged herein, violate the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and D.C. Human Rights Act, D.C. Code § 2-1402.21.

b.    Permanently enjoining Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, from refusing to rent to tenants who participate in the Section 8 voucher program on the basis of their source of income;

c.    Requiring Defendants and their agents, subsidiaries, affiliates, employees, successors, and all other persons in active concert or participation with them, to develop and implement policies, practices, and procedures that do not discriminate against persons protected by federal fair housing laws and the laws of the District of Columbia;

d.    Awarding Plaintiff all available monetary damages in an amount to be determined at trial, including, but not limited to, compensatory damages, as well as punitive damages in an amount that would punish Defendants for the willful, wanton, and

reckless conduct alleged herein, and that would effectively deter similar conduct

in the future;

e.      Awarding Plaintiff reasonable attorney's fees and costs; and

f.      Awarding such other relief as the Court deems just and proper.


## JURY TRIAL

Plaintiff requests trial by jury as to all issues in this case.


Dated:  _____                Respectfully submitted,

                                        /s/        Heather R. Abraham
                                        Aderson B. Francois (DC Bar No. 498544)
                                        Heather R. Abraham (DC Bar. No. 1616335)
                                            *Pro hac vice*
                                        Civil Rights Clinic
                                        Georgetown University Law Center
                                        600 New Jersey Avenue NW, Suite 352
                                        Washington, DC 20001
                                        (202) 661-6739
                                        (202) 662-9634 (fax)
                                        aderson.francois@georgetown.edu
                                        heather.abraham@georgetown.edu


                                        /s/        Morgan Williams
                                        Morgan Williams (DC application pending)
                                        National Fair Housing Alliance
                                        1331 Pennsylvania Avenue NW, Suite 650
                                        Washington, DC 20005
                                        (202) 898-1661
                                        mwilliams@nationalfairhousing.org
                                        *Pro hac vice*